UNITED STATES of America, ex rel. Timothy J. WALSH, Plaintiff,

v.

EASTMAN KODAK COMPANY, Abbott Laboratories, Tyco International, Ltd., f/k/a The Kendall Company, E.I. Dupont de Nemours and Company, Miles, Inc., Picker International, Inc., Baxter Healthcare Corporation, Dade Diagnostics International, Dade Microscan, Inc., The Carney Hospital, Inc., Individually and on behalf of those similarly situated and Daughters of Charity National Health System, Inc., as their sponsoring organization and on behalf of those similarly situated, Defendants.

No. Civ.A. 95–12545–PBS.

United States District Court, D. Massachusetts.

May 31, 2000.

Susan G. Winkler, United States Attorney's Office, Boston, MA, Floyd H. Anderson, Mark Roder, Campo Anderson LLP, Boston, MA, Charles M. Campo, Jr., Campo Anderson, LLP, Boston, MA, for plaintiff.

Samuel F. Davenport, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Eastman Kodak Company, defendant.

Daniel E. Reidy, R. Christopher Cook, Anastasia Katinas, Jones, Day, Reavis & Pogue, Chicago, IL, Douglas S. Brooks, Goodwin, Procter & Hoar, Boston, MA, Ralph F. Boyd, Jr., Goodwin Procter & Hoar LLP, Boston, MA, for Abbott Laboratories, defendant.

Michael Paris, Gerald P. Tishler, Amanda B. Varella, Brown, Rudnick, Boston, MA, for Kendall Company, The, defendant.

Susan J. Baronoff, Roche, Carens & DeGiacomo, P.C., Boston, MA, for Dupont Merck Pharmaceuticals Company, defendant.

Mary Elizabeth Buckles, Reed, Smith, Shaw & McClay, Washington, DC, Eugene

Tillman, Joseph W. Metro, Tamara V. Scoville, Reed Smith Shaw & McClay LLP, Washington, DC, for Miles, Inc., defendant.

James S. Dittmar, Mark D. Robins, Hutchins, Wheeler & Dittmar, Boston, MA, for Picker International, Inc., defendant.

Michael Kendall, McDermott, Will & Emory, Boston, MA, Michele E. Granda, McDermott, Will & Emery, Boston, MA, Michele E. Granda, McDermott, Will & Emery, Boston, MA, for Baxter Healthcare Corporation, Dade International, Dade Microscan, Inc., defendants.

E. Michael Flanagan, Tara M. Vold, Gardner, Carton & Douglas, Washington, DC, Ross Ginsberg, Gilman, McLaughlin & Hanrahan, Boston, MA, Michael Eby, Gilman, McLaughlin & Hanrahan LLP, Boston, MA, Attison L. Barnes, Gardner, Carton & Douglas, Washington, DC, for Carney Hospital, Daughters of Charity National Health Systems, defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

This is a *qui tam* action brought by the relator, Timothy Walsh ("Relator"), pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), on behalf of the United States. Relator seeks to recover penalties and damages arising from false or fraudulent cost reports allegedly submitted by the defendants, Carney Hospital, the Daughters of Charity National Health System ("DCNHS") and various unnamed hospital defendants. Walsh is the Chief Financial Officer at Carney Hospital. As to each set of hospital defendants, Relator also alleges common law violations, including fraud, payment under mistake of fact, and unjust enrichment.

Relator also brings suit against nine vendor defendants, who allegedly caused the false claims to be submitted by failing to report, or misreporting, discounts on supplies and equipment purchased by the hospitals. Specifically, Relator asserts that the vendor defendants' discount and rebate programs amount to unlawful kickbacks under the Medicare Anti–Kickback Act, 42 U.S.C. § 1320a–7(b) (a.k.a. the "AKA"). Relator alleges that those undisclosed, and unpermitted, discounts and rebates "caused" the hospitals to submit false claims to the government in violation of the FCA.

The United States intervened, and settled this matter with respect to defendants Carney Hospital and DCNHS (collectively referred to herein as "DCNHS"). Under the settlement agreement entered into by the Relator, the United States, and DCNHS, the Relator agreed to release all claims against those hospitals upon receipt by the United States of an initial settlement amount. That initial amount was based upon an audit that had been performed within DCNHS of unreported and misreported discounts from contracts with Eastman Kodak. Relator was to receive an additional amount once another audit encompassing all the contracts at issue was performed on the hospitals. Relator alleges that because the second audit was performed unsatisfactorily, the parties have not complied with the provisions of the settlement agreement. DCNHS moves for dismissal, or alternatively for summary judgment, asserting that the unambiguous language of the settlement agreement released them upon Relator's acceptance of the initial amount.

The United States declined to intervene against the vendor defendants and the unnamed hospital defendants, and the Relator elected to proceed with the litigation, as provided for under 31 U.S.C. § 3730(b)(4). The vendor defendants have moved individually, and collectively, for dismissal of the First Amended Complaint under Fed.R.Civ.P. 9(b) and 12(b)(6). The vendors argue that: (1) Relator has failed to plead with specificity the "who, what, where, and when" of his false claims alle-

gations; (2) a violation of the AKA does not give rise to a FCA claim as a matter of law; (3) even if it did, the Relator has not alleged that the vendor defendants acted with the required state of mind under either law.

For the reasons stated below, after hearing, I *ALLOW* DCNHS's motion to dismiss or for summary judgment on the ground that the settlement agreement bars this action. I *ALLOW* the vendor defendants' motion to dismiss under FedR. Civ.P. 9(b) *with prejudice.*

## BACKGROUND FACTS

### A. The DCNHS Hospital Defendants

The following facts are undisputed, unless otherwise noted. On November 22, 1995, Relator, on behalf of the United States, filed a *qui tam* action under the FCA, alleging that DCNHS submitted false claims for payment to the United States government in connection with applications for reimbursement under the Medicare and Medicaid programs. On July 14, 1998, the United States Attorneys Office ("USAO") and the Department of Justice ("DOJ"), on behalf of the Office of the Inspector General of the Department of Health and Human Services ("OIG–HHS"), elected to intervene in the action with respect to DCNHS.

From July 1997 to July 1998, the USAO and DCNHS engaged in settlement negotiations. On July 27, 1998, the United States filed a complaint against DCNHS and four hospitals for alleged violations of the FCA based upon unreported or misreported Kodak discounts on the hospitals' cost reports. On that same day, the USAO, Relator, and DCNHS filed a stipulation of partial dismissal, under which the parties voluntarily dismissed with prejudice all claims related to the complaint against DCNHS. The stipulation was filed with the understanding that the parties would execute a settlement agreement. On August 3, 1998, this Court entered an order enforcing the parties' stipulation and requiring that all contents in the file be kept under seal, with the exception of the stipulation itself and the government's election to intervene.

On August 27, 1998, the USAO and DOJ (on behalf of OIG–HHS), DCNHS, and the Relator executed a settlement agreement (the "Agreement"). Under the Agreement, DCNHS agreed to pay the United States $586,075 as an initial settlement amount resulting from an audit of the Kodak discount program. The Relator was to receive $129,500 of the initial settlement amount, and the Agreement provided that:

> Timothy Walsh (the "Relator") agrees that the settlement of claims in the Civil Action is fair, adequate and reasonable under all of the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B). On the United States' receipt of [the initial settlement amount], Relator, for himself, his heirs, successors and assigns, will release and will be deemed to have released the four Hospitals and DCNHS from any and all claims that Relator has or may have that arises under or relates to any of the allegations in the Civil Action or the Covered Conduct, except as they relate to a claim for reasonable attorney's fees, expenses, and costs pursuant to 31 U.S.C. § 2730(d)....

DCNHS transferred the initial settlement amount to the United States on July 29, 1998. The United States then sent the Relator his share.

The Agreement also provided that DCNHS would pay two times the total losses to Medicare, which would be calculated based on the results of a further audit of the other vendor programs. That follow-up audit was to be performed by the Catholic Healthcare Audit Network ("CHAN"), which had successfully conducted the Kodak audit of the DCNHS hospitals. Paragraph 6 of the Agreement required, in pertinent part, that:

> The audit will be conducted using the same methodology CHAN used to audit Kodak discounts, with the modification that unreported discounts used to pur-

chase equipment or pay for leases will be included as unreported discounts regardless of the treatment of depreciation or lease payments in the cost report.... DCNHS will provide the audit work papers, back-up documentation, pertinent portions of any rerun cost reports, and all summaries thereof to HHS Office of Investigations in Boston, Massachusetts ("OI–HHS")....

Under the Agreement, OIG–HHS was given responsibility to verify that CHAN followed the agreed upon audit methodology and that the documentation supported CHAN's results. OIG–HHS would then calculate the total Medicare loss, determine the final settlement amount due from DCNHS, and notify the USAO and DCNHS to arrange transfer of that amount. The USAO would then pay the Relator a 22% share of the final settlement amount. (See Agreement at ¶ 15).

In October of 1998, the United States sought a status report from DCNHS regarding the vendor audit, which was supposed to be completed within four months from the date of the Agreement. A representative from CHAN advised the government that CHAN had started the audit of one of the DCNHS hospitals, but was having trouble finding specific information about discounts from other vendors. He likened his task to finding a "needle in a haystack." The United States reviewed its own investigative materials on the vendor defendants to attempt to help CHAN better target its audit. However, the United States was unable to provide any "meaningful assistance."

On April 9, 1999, the results of CHAN's vendor audit were forwarded to OIG–HHS. On June 3, 1999, the Relator filed his First Amended Complaint, setting forth virtually the same allegations against DCNHS as were contained in his original complaint, and adding common law claims. On June 4, 1999, OIG–HHS requested the work papers of two specific audits, and CHAN provided that documentation. On June 22, 1999, OIG–HHS notified the USAO that the total Medicare loss had been determined and accepted. The USAO instructed DCNHS to transfer the final settlement amount of $146,508; DCNHS transferred those funds on July 1, 1999. By letter on July 1, 1999, the Relator's attorney instructed the USAO to hold the Relator's share of the final settlement amount in a suspense account pending a resolution of the scope of CHAN's audit. In a follow-up letter on July 2, 1999, the Relator notified the USAO of his concerns about deficiencies in the audit.

## B. The Vendor Defendants

The facts alleged in the First Amended Complaint, which for present purposes must be deemed true, are as follows.

The nine vendor defendants entered into contracts with the defendant hospitals for supplies and goods for which the hospitals are reimbursed (at least in part) under the Medicare program. The contracts include provisions under which the vendors pay, and the hospitals receive, remuneration in the form of leases of capital equipment, cash rebates, credits towards the future purchase of goods, or discounts on a vendor's other products. Relator alleges that the vendor defendants submitted invoices to the defendant hospitals that did not reflect the applicable discounts and credits. As a result, when the hospitals filed their cost reports with Medicare to seek reimbursement, those cost reports failed to fully and accurately report discounts or other remuneration received by the hospital under the vendor contracts. In turn, Relator alleges, the hospitals submitted false claims for reimbursement to the United States.

## C. The Broad Hospital Classes

In addition to the DCNHS hospitals, Relator's First Amended Complaint alleges the same False Claims Act violations by ten classes of hospitals, which includes every hospital in the United States which has entered into similar contracts with the

vendor defendants. As to these hospital classes, Relator also brings the common law claims of fraud, payment under mistake of fact, and unjust enrichment.

## DISCUSSION

### A. The DCNHS Hospital Defendants' Motion to Dismiss or for Summary Judgment

█ Since the resolution of DCNHS' pending motions requires the Court to refer to a document, namely the Agreement, outside the four corners of the Relator's First Amended Complaint, I apply the Rule 56 summary judgment standard. The parties acknowledged at oral argument that the proceeding was properly converted into one for summary judgment. *See Watterson v. Page,* 987 F.2d 1, 3–4 (1st Cir.1993).

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

The DCNHS hospital defendants assert that by the unambiguous terms of the Agreement, the Relator released DCNHS from the same claims he now re-asserts against them. Specifically, the Agreement provided that, upon receipt by the United States of the initial settlement amount, the Relator would be deemed to have released his claims against DCNHS, except as to attorneys' fees and costs. (Agreement at ¶ 14.) The United States received that initial settlement amount on July 29, 1998 and promptly sent the Relator his share. Moreover, the hospital defendants assert that Relator lacks standing to contest the audit methodology, since the government is the real party in interest.

The Relator responds that the release provided for in the Agreement was conditioned upon DCNHS conducting an audit using the same methodology as that used in the Kodak audit. Relator contends that the CHAN audit of the other vendor programs did not use the same methodology as the Kodak audit, because the second audit did not account for non-cash remuneration (such as credits and equipment leases) issued under the vendor programs. Relator insists that he would not have signed the Agreement if it had not provided for use of the Kodak audit methodology. Relator alleges that since DCNHS did not perform its obligations under the Agreement, the Relator's release is not yet effective. Finally, Relator argues that both the United States and DCNHS breached the implied covenant of good faith and fair dealing inherent in all contracts, which gives rise to an enforceable action by the Relator for specific performance. But since Relator did not include these bad faith allegations in his First Amended Complaint, they are not properly considered.

█ Relator's argument as to DCNHS fails. Under the canons of contract interpretation, "contracts containing unambiguous language must be construed according to their plain and natural meaning." *Smart v. The Gillette Co. Long–Term Disability Plan,* 70 F.3d 173, 178 (1st Cir. 1995). The language of paragraph 14 of the Agreement is clear and unambiguous; once the United States received the initial settlement amount, Relator relinquished his claims against the DCNHS hospitals. It is undisputed that the United States received that amount, and gave the Relator his share. This Court's dismissal with prejudice on August 3, 1998, of the identical claims now raised by Relator, simply gave effect to the joint stipulation that was voluntarily entered into by the Relator, the United States, and DCNHS.

It is equally clear from the Agreement that the United States, specifically OIG–HHS, was charged with ensuring that the CHAN audit was performed properly. Accordingly, the Agreement provided that the United States would not release *its*

claims against DCNHS until the total Medicare loss was determined and the final settlement amount tendered. This arrangement is not only clear from the Agreement, but is in accord with a basic principle underlying the False Claims Act—that the United States is the real party in interest.[1] *See United States ex rel., Killingsworth v. Northrop Corp.,* 25 F.3d 715, 720 (9th Cir.1994); *United States ex rel. Milam v. University of Tex. M.D. Anderson Cancer Ctr.,* 961 F.2d 46, 50 (4th Cir.1992).

## B. Vendor Defendants' Motion to Dismiss

### 1. *Rule 9(b) Particularity*

 The vendor defendants, individually and jointly, move to dismiss the First Amended Complaint under Fed.R.Civ.P. 9(b) and 12(b)(6).[2] Where fraud is alleged, Fed.R.Civ.P. 9(b) requires "the circumstances constituting fraud ... shall be stated with particularity." Claims brought under the FCA must satisfy the requirements of Rule 9(b), setting forth the "who, what, when, where, and how" of the alleged fraud. *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir.1997) (citations omitted). Even where those requirements are relaxed somewhat, because the facts relating to the alleged fraud are "peculiarly within the perpetrator's knowledge," claims of fraud may not be based upon speculation or conclusory allegations. *Id.* Finally, where allegations of fraud are based on information and belief, the complaint must set forth a factual basis for such belief. *See id.*

 The vendor defendants argue that Relator's First Amended Complaint fails to allege its claims with particularity. Specifically, the complaint does not identify or describe any specific hospital cost reports or transactions that allegedly give rise to violations of the FCA. Rather, the First Amended Complaint merely describes the contracts between the vendor defendants and defendant hospitals, but does not identify with particularity any sales or claims for payment that were allegedly fraudulent. Most of the Relator's allegations of fraud are based solely on "information and belief" without pleading the source of the Relator's information or the reasons for his belief.

In response, Relator argues that the complaint describes with particularity how, under each contract, the vendors issued invoices that falsely inflated the cost of supply items for which hospitals would seek Medicare reimbursement. Relator emphasizes that he has not been given access to the documents considered by the government in its investigation conducted during the seal period. Relator insists that the information concerning which hospitals participated in the programs in question, the amounts of remuneration paid to those hospitals, and the documentation provided by the vendors to the hospitals are all within the exclusive control of the vendors. As such, Relator contends that he has met his obligations under Rule 9(b).

I agree with the vendor defendants. Relator's First Amended Complaint, in essence, sets out a methodology by which the vendors might have produced false invoices, which in turn could have led to false claims. Without citing a single false claim arising from an allegedly false invoice, Relator has not met even a barebones Rule 9(b) test. *See Ex rel. G. Michael Gublo, et al v. Novacare, Inc.,* 62 F.Supp.2d 347, 354 (D.Mass.1999) (dismissing complaint under Rule 9(b) where relator alleged three methods by which the defendant inflated its bills to the govern-

---

**1.** At oral argument, the Assistant United States Attorney represented that the United States is currently gathering more information to see if the CHAN audit was indeed properly performed.

**2.** Relator submitted his affidavit which the court does not consider for purposes of evaluating the motion to dismiss.

ment, but didn't cite a single instance of a false claim).

As to the Relator's position that this information has been withheld from him, this factor does not bear on his ability to provide specifics of false invoices and false claims within Carney Hospital. As Chief Financial Officer of Carney, the Relator is certainly in a position to uncover a false cost report that resulted from false invoices, if one exists within Carney. Relator has not done so, either in his original complaint, or his First Amended Complaint filed some three and a half years later. Without specifying any false documentation within his own hospital, Relator asks the Court to permit discovery of a broad, nation-wide class of hospitals which participated in the vendor purchasing programs. Relator has not provided ample basis for his "information and belief" as to the vendor defendants, or as to these broad hospital classes. *See In re Boston Tech., Inc. Sec. Litig.*, 8 F.Supp.2d 43, 53 (D.Mass.1998) ("[T]he First Circuit looks cautiously upon plaintiffs alleging fraud purely on the basis of information and belief.") Especially in light of the striking lack of detail he provides as to Carney, the First Amended Complaint is dismissed with prejudice.

### 2. *Kodak*

■ The claim against Kodak merits separate discussion because the audit conducted pursuant to the DCNHS settlement revealed false hospital cost reports regarding Kodak products. The complaint makes the following allegations. Kodak manufactures medical x-ray film and related health imaging products for hospitals, and distributes these products to various hospital supply companies (like defendant Picker), which in turn sell to the hospitals. The supply companies invoiced defendants for the price of the film and supplies. The invoices reflected the 40 percent discount off the list price of the product. In addition, Kodak provided accrual and tiered discounts. The supply companies sent the

hospital's purchase information to Kodak, which then issued accrual credits.

At the end of each quarter, Kodak sent DCNHS an accrual account statement which summarized the account activity for the quarter, showing all Kodak film and supply purchases, the accrual deposits resulting from the film purchases, and any amounts drawn against the accrual balances. The quarterly statement included the following information:

> Kodak views accrual rebates as a reduction in the price of the products purchased. The customer is reminded that Section 12128B(b) of the Social Security Act requires that reductions in price be properly disclosed and reflected in the costs claimed by a provider under Medicare or a State health program.

When the defendant hospitals used the accruals to purchase or lease Kodak equipment or to offset the cost of Kodak products, the transaction was reported on the hospital's quarterly statement. When a check was requested, the check was provided and contained the following notation:

> THE ENCLOSED CHECK CONSTITUTES A REBATE. KODAK VIEWS THE REBATE AS A REDUCTION IN THE PRICE FOR THE ITEM PURCHASED. THE CUSTOMER IS REMINDED THAT SECTION 1128B(b) OF THE SOCIAL SECURITY ACT REQUIRES THAT REDUCTION IN PRICE AND DISCOUNTS BE PROPERLY DISCLOSED AND REFLECTED IN THE COSTS CLAIMED OR CHARGES MADE BY A PROVIDER UNDER MEDICARE OR A STATE HEALTH PROGRAM.

Relator faults Kodak because the invoices for its x-ray supplies submitted by the Kodak hospital supply companies to the DCNHS hospitals do not reflect the applicable accrual and tiered discounts and do not inform the buyer of its obligations to report these discounts to the United States.

In fact, Relator's claims against Kodak do not allege a straightforward violation of the FCA; rather, they allege that Kodak's actions violate "the false claims provisions of 42 U.S.C. § 1320a–7(b), 42 C.F.R. § 1001.952(h)(3)(i) and 42 C.F.R. § 1001.952(h)(3)(ii)." This is the Medicare Anti–Kickback Act, a criminal statute, and two accompanying safe harbor regulations; the provisions invoked by Relator deal with certain types of "illegal remuneration" in Medicare programs. The safe harbor regulations allow exceptions to the AKA for certain discount programs. Relator's theory is that by failing to ensure that its discount program met the statutory discount exception to that statute, Kodak in turn violated the FCA. However, even if a violation of the AKA could give rise to a cause of action under the FCA, the AKA itself requires proof that a person acted "knowingly and willfully." Absent other allegations, even when all inferences are drawn in Relator's favor, Kodak's disclosures in its reports to the hospitals negate any inference of improper scienter.

Moreover, regardless of whether the discounts fell within the AKA's statutory discount exception, plaintiff never alleges with the requisite particularity that Kodak knowingly presented, caused the presentation of, or conspired to present any false cost report to the government. *See United States v. Rivera*, 55 F.3d 703, 706 (1st Cir.1995); 31 U.S.C. § 3729(a)(1). The reasonable inferences from the allegations suggest the contrary. Indeed, there is no allegation that Kodak even submitted invoices to Carney Hospital which falsely inflated the costs of items reimbursable under the Medicare program.

### C. Common Law Claims

■ Relator asserts three common law claims—fraud, payment under mistake of fact, and unjust enrichment—against DCNHS and the broad hospital classes. As to DCNHS, the release language within the Agreement precludes the Relator from bringing "any and all claims that Relator has or may have that arises under or relates to any of the allegations in the Civil Action." (*See* Agreement at ¶ 14.) But more fundamentally, the Relator lacks standing to bring any common law claims on behalf of the United States.

By its express language, the FCA allows a private citizen to "bring a civil action for a violation of section 3729" of the Act, on behalf of both himself and the United States. 31 U.S.C. § 3730(b)(1). The FCA also allows the relator to proceed with the action where the United States declines to intervene. *See* 31 U.S.C. § 3730(b)(4). As the Supreme Court recently explained, the FCA effects a "partial assignment of the Government's damages claim" to the relator. *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, —— U.S. ——, 120 S.Ct. 1858, 1862, 146 L.Ed.2d 836 (2000). In this way, the statute allows a relator alleging an FCA violation to surmount the Article III standing barrier which would otherwise exist. *See id.* But the FCA does not give relators the right to assert common law claims on behalf of the United States. *See United States ex rel. Long v. SCS Bus. & Tech. Inst.*, 999 F.Supp. 78, 92 (D.D.C.1998), *rev'd on other grounds*, 173 F.3d 870 (D.C.Cir.1999); *United States ex rel. Mayman v. Martin Marietta Corp.*, 894 F.Supp. 218, 225–26 (D.Md.1995). As to his common law theories, Relator does not claim that he suffered an injury in fact— that, for example, *he* was defrauded or unjustly enriched by the defendants. He, therefore, lacks standing to assert any common law claims.

### CONCLUSION

I ***ALLOW*** DCNHS Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment (Docket No. 80), and the Vendors' seven motions to dismiss (Docket Nos. 85, 86, 88, 93, 94, 98 and 99) ***with prejudice.***